Edward B. Adams v. Commissioner.
Adams v. Commissioner
Docket No. 3103-67.
United States Tax Court
T.C. Memo 1970-104; 1970 Tax Ct. Memo LEXIS 256; 29 T.C.M. (CCH) 476; T.C.M. (RIA) 70104; May 6, 1970, Filed. George Constable, Norton Bldg., Seattle, Wash., for the petitioner.Stephen E. Silver, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in petitioner's Federal income tax for the year 1960 in the amount of $3,725.36. Petitioner has also been assessed with a penalty in the amount of $208.28 under section 6653(a) of the Internal Revenue Code *257 of 1954. [1]
The only issues for decision are: (1) whether petitioner misappropriated funds belonging to his deceased mother, which are properly includable in his income for the year 1960 and in excess of 25 percent of the income reported in his 1960 Federal income tax return; and (2) whether petitioner in filing his 1960 income tax return negligently or intentionally disregarded rules and regulations which justifies imposition of a 5-percent penalty under section 6653(a). Findings of Fact Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. Edward B. Adams (hereinafter sometimes referred to as Edward or petitioner) was a legal resident of Sumner, Washington, at the time the petition herein was filed. In 1960 he was a resident of St. Paul, Minnesota, and filed a separate U.S. Individual Income Tax Return for that year with the district director of internal revenue in St. Paul, Minnesota. Edward was the only child of Mabel B. Adams (hereinafter sometimes referred to as Mabel) and Edward C. Adams. Until 1955, Edward's *258 father was an Assistant Regional Counsel of the Internal Revenue Service in St. Paul. His father retired in 1955 and engaged in the private practice of law until his death in September 1959. For sometime, while petitioner's parents were living, they maintained a joint checking account in The First National Bank of Saint Paul, Minnesota, (hereinafter sometimes referred to as First National). Following the death of Edward's father, Mabel transferred the joint account into her own name in October 1959. In June of 1960 Mabel underwent surgery for cancer and was hospitalized for approximately three weeks. Thereafter she convalesced at her residence in St. Paul but was again hospitalized in late August of that year and treated for cancer for three weeks. In mid-September Mabel was transferred from the hospital to a nursing home where she received care as a bedridden patient. Shortly before September 8, 1960, Edward telephoned Carl Peterson, an assistant vicepresident of First National, and a personal friend of his parents, to request a form by which his mother could give him power of attorney to withdraw funds from her account in that bank. The power of attorney in the form provided, *259 dated September 8, 1960, was signed by Mabel and Edward and was received by First National on September 9, 1960, at which time the balance in Mabel's account was $14,495.54. The document reads as follows: 477 Power of Attorney Title of Account Account Number 8-011-2 Mrs. Mabel B. Adams THE FIRST NATIONAL BANK OF SAINT PAUL, MINN.
Below is the signature of Edward B. Adams who is authorized to sign and/or endorse checks and drafts, either for deposit or for the withdrawal of funds, with The First National Bank of Saint Paul in my name. This power of attorney shall be binding upon me, my heirs, legal representatives and assigns, until the First National Bank of St. Paul shall receive written notice of revocation thereof from me or in the event of my death, disability or any other cause of revocation until said bank shall receive notice thereof. /S/ Mabel B. Adams (Person giving authority sign here) By /S/ Edward B. Adams (Person authorized sign here using name of person giving authority by their own name.) Address 627 No. Lexington Pkwy., St. Paul 4, Minn.
Date September 8, 1960 Edward undertook this action in order to utilize the funds to pay his mother's *260 bills. On October 15, 1960, Edward had a conversation with Carl Peterson, [2] the substance of which was as follows: "Well," Ed said, "Carl, my mother, is in the cancer home and I was informed today that she is dying. I want - I am the only heir, and I want the money transferred from her account to my checking account." He said that in the event of her death the Power of Attorney would be meaningless, a useless instrument, and he wouldn't be able to write checks, and then… Ed said, "Well, if she should die over the weekend, and the estate goes into probate, the money would be tied up, and I won't be able to write checks.' [Mr. Adams said] that he had visited his attorney, Mr. McCollister, and Mr. McCollister has suggested that he transfer this account into his name as trustee for Mabel Adams." Carl Peterson stated to Edward that the transfer could not be made on that date and that he would have to come to the bank the following Monday. On that Monday, October 17, 1960, the balance in the checking account, amounting to *261 $13,333.17, was transferred by Edward into a checking account entitled "Edward B. Adams as Trustee for Mabel B. Adams." At the time the funds were transferred the bank telephoned the nursing home and was informed that Mabel was alive and of sound mind. Various checks were written from this account. Mabel died of terminal cancer on October 22, 1960. Edward had not known until two or three weeks before the time of death that his mother's condition was terminal. On November 3, 1960, at the request and direction of Edward, the full balance of $13,045.08 in the account of "Edward B. Adams as Trustee for Mabel B. Adams" was transferred to a checking account in First National in the name of "Edward B. Adams, 627 North Lexington Parkway, St. Paul 4." Before November 3, but after Mabel's death, several checks drawn on the trustee account had been honored by the bank. On November 4, 1960, Edward transferred $12,000 from this checking account into a savings account in the above-mentioned bank in the name of "Edward B. Adams, 627 North Lexington Parkway, St. Paul 4." The balance in the checking account in First National as of December 30, 1960, was $465.32. Before the end of the year, *262 Edward had made three deposits in this checking account - $500 on November 29, 1960, and $750 on December 15, 1960, both of which were from funds in the savings account, and $272.05 in December 1960, which was a check to Mabel for a widow's allowance which she received from the Chief Counsel's Office, Internal Revenue Service. At all times in 1960 and 1961 Edward maintained a personal account at the Northwestern National Bank of Minnesota and another at the Empire National Bank of St. Paul. Mabel's last will and testament executed on April 11, 1957, was proved and admitted to probate on May 31, 1961. The will made no provision for Edward and reads in part as follows: III. A. I have considered my son, Edward Byrne Adams, and have intentionally excluded him from participating in my estate, not because of any lack of love and affection for my son but because I have heretofore given him, as far as was 478 economically possible, an education and have, to the best of my ability, assisted him in establishing himself. B. I also intentionally exclude all hereafterborn children of my son, Edward Byrne Adams, it being my intention that only my named grandchildren, Edward Dennis *263 Adams, Kathleen Mary Adams, and Patricia Margaret Adams, be included among the possible participants in my estate. James McCollister was specifically designated in the will to be the executor of the estate. Through an indirect route, however, Edward was to receive some funds from his mother. In the latter part of October 1959, Mabel contacted her niece Jeannette Higgins (hereinafter sometimes referred to as Jeannette) concerning the opening of a joint savings account. Mabel stated to Jeannette that her property was bequeathed to her grandchildren, but she did not feel that her child, Edward, should be disinherited completely and, accordingly, she would like to set up the proposed joint bank account with her niece. Mabel instructed Jeannette that upon her death, Jeannette, as the surviving joint tenant, was to pay the funds to Edward. Jeannette agreed to this arrangement and about ten days thereafter she received the signature card from Mabel in the mail. She signed and returned the card, but never saw the bank passbook for this account. On November 13, 1959, the account was opened with a deposit of $1,000. No other deposits were made after that time. In late 1960 or early 1961, *264 Edward terminated his employment with the Minneapolis Society for the Blind, where he had worked since 1950, and moved to the State of Washington in March 1961. At the time he left St. Paul he was paying $97.50 per month as child support to his first wife from whom he had obtained a divorce in 1954. On November 28, 1961, a default judgment was entered against Edward in the District Court, Second Judicial District, County of Ramsey, State of Minnesota. Edward's account at the First National and his account at Northwestern National Bank, as well as the joint savings account of Jeannette Higgins and Mabel, were garnished. This decision reads in part as follows: State of Minnesota District Court County of Ramsey 2d Judicial District Joseph A. Rheinberger as Administrator C.T.A. of the Estate of Mabel Brynes Adams, * * * Plaintiff, Finding of Fact, v. Conclusions of Law, and Edward Byrne Adams, Order for Defendant Judgment This matter came on to be heard before the Court in Chambers on November 28, 1961, upon motion of the plaintiff for judgment against the defendant. Gerald H. Hanratty, Attorney at Law, appeared on behalf of plaintiff and no one appeared on behalf of defendant. And *265 the Court, having heard the evidence and the arguments of counsel, and being fully advised in the premises, now makes the following findings of fact, conclusions of law, and order for judgment. Findings of Fact 1. That summons and complaint in said action have been duly served on the defendant therein and said summons complaint with proof of service by publication thereof duly filed in the office of said Court. That the time allowed by law specified in said summons for said defendant to answer the complaint in said action has elapsed and that no answer has been served and defendant is in default herein. 2. That the defendant in the above entitled action, October 17, 1960, fraudulently converted to his own use funds of the plaintiff's decedent in the amount of $13,333.17, which funds had been entrusted to defendant by plaintiff's decedent. That no part thereof has been repaid by defendant. 3. That garnishments have been served on the First National Bank of St. Paul, the Lake Street Office, the Northwestern National Bank in Minneapolis and upon Jeannette Higgins, that the First National Bank of St. Paul on the 11th day of April, 1961 disclosed that at the time of the service *266 of the Garnishee Summons there was due and owing the defendant from the said garnishee the sum of $4,347.97. That the Northwestern National Bank, Lake Street Office, disclosed that on the 12th day of April, 1961, at the time of the service of Garnishee Summons herein there was due and owing the defendant of above name from said garnishee the sum of $42.53. That Jeannette Higgins disclosed she had in her possession $1,038.04, which was placed in a joint account by plaintiff's decedent under instructions from said decedent to pay the funds to defendant upon her death. That supplemental complaint was served on Jeannette Higgins and she is in default in that action. 479 Conclusion of Law That plaintiff is entitled to judgment against defendant, Edward Byrne Adams, in the amount of $5,428.54, plus costs and disbursements herein and judgment to be entered accordingly. By the Court /s/John W. Groff Judge of District Court Dated November 28, 1961. In his 1960 income tax return, Edward reported as his entire gross income his salary from the Minneapolis Society for the Blind in the amount of $8,126.60 and "excess entertainment allowance" of $482.44. On March 27, 1967, respondent *267 issued his statutory notice of deficiency. In his notice, respondent determined that Edward - realized income in the amount of $13,333.17 by converting to your own use funds from the Estate of Mabel Byrnes Adams. * * * Opinion The primary issue for decision is whether Edward misappropriated Mabel's funds in 1960 and hence should have included the amount misappropriated in his income tax return for that year. If Edward did misappropriate such funds, they would be includable within the sweep of "gross income" under section 61(a). [3]James v. Commissioner, 366 U.S. 213 (1961). Respondent contends that such misappropriation occurred either at the time the account as trustee for Mabel was set up on October 17, 1960, [4] or, at the time Edward transferred the funds from the trustee account to the account under his own name. *268 Since respondent in the instant case failed to assess the determined tax within the three-year statute of limitations of section 6501(a) [5] he now relies on the exception to such period provided by section 6501(e), [6] which permits a six-year statute of limitations when a taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the gross income stated in his return. The burden of proof as to the omission, and its amount, is on respondent. Cf. C.A. Reis, 1 T.C. 9 (1942). *269 There is no evidence that the transfer from Mabel's account to the trustee account on October 17, 1960, was unauthorized by Mabel. She had already given Edward a broad power of attorney as to her account on September 8, 1960, and we look upon his use of that power to transfer the account to himself "as trustee for Mabel B. Adams" as being a mere form change which neither triggered nor indicated any different rights, duties or liabilities. The holder of a power must act in the best interests of his principal, a trustee must act in the best interests of his beneficiary. Assertions by respondent that Mabel was in an unconscious state at the time of the transfer have not been proven. Likewise, there is no evidence to prove that Edward appropriated any money from this account to pay his personal expenses rather than his mother's expenses. The default judgment's conclusions of law and fact are not admissible to prove the truth of the matter therein stated with regard to the transfer of October 17. While we consider the circumstances surrounding this transfer to be suspicious, we think that respondent has not met his burden to show any misappropriation at this point in time. The transfer *270 of $13,045.08 from the trustee account to the checking account in Edward's sole name on November 3, 1960, presents an entirely different matter. We can perceive no legitimate reason for this transfer other than an intention on Edward's part to obtain unrestricted dominion and control over the funds, unimpeded by the limitations which would follow from the funds remaining in the trustee account. This transfer creates a rebuttable presumption that a misappropriation took place, and shifts to 480 petitioner the burden of going forward with the evidence to persuading us to the contrary. In explanation, petitioner contends that the purpose of the transfer from the trustee account into the checking account in his sole name on November 3 was to obtain "interest" on the money which was subsequently placed in the savings account on November 4, 1960. This does not, however, explain why the money was first placed in his own checking account before being subsequently transferred. Nor does it explain why the money placed in the savings account was not also put in "trust" for Mabel. Edward testified in the above regard that the savings and checking accounts in his name were "the same type *271 of thing for the same purposes." He stated: "when I went to the bank and had this done, in my mind it was all to be a continuation of the same thing and, frankly, I didn't specifically notice at the time whether it said 'as trustee' or not." It is hard for us to believe that Edward did not notice that the card he signed on November 3, 1960, for the transfer to the checking account, did not say "trustee." When Edward transferred the money from Mabel's checking account to the trustee checking account on October 17, 1960, he specifically signed a request for the new account to be in his name as trustee. There is no reason why he should not have requested the same designation in this November 3 transfer. The simple fact is that it would have been meaningless to transfer the money from one checking account as trustee to another checking account as trustee on that date. Checks written on the trustee account cleared the bank after Mabel's death and there is no indication in the record that any trouble with this account caused the sudden transfer to the checking account in his sole name. It was not, however, meaningless to make the transfer into Edward's sole checking account, where his *272 dominion over the funds was complete. As for the transfer to the savings account on November 4, Edward maintained the same complete dominion over the funds as he had over his sole checking account. There is no reason, other than an intention to misappropriate, for not having designated this account as "trustee," as he had done in the transfer on October 17, 1960. Apparently recognizing the lack of any valid reason for the transfer on November 3, petitioner contended at trial, somewhat belatedly, that in fact there was no transfer, which contention is contrary to the stipulation of fact 22 [7] that he made. Even if we could allow such a contradiction of the agreed stipulation, there is no sufficient basis for such an assertion. The only evidence to substantiate petitioner's position is the fact that the account number for the trustee account, No. 30-51292, appeared on one of the ledger pages for Edward's checking account. We find this to be insubstantial. *273 Finally, petitioner claims that no misappropriation took place because he utilized the money only to pay his mother's medical and funeral expenses in 1960 and 1961. But there was no legal obligation for Edward to pay his mother's bills. These could have been paid out of her estate for which an executor was specifically designated in Mabel's will. While Edward testified that he paid only Mabel's bills with the funds, we do not find his testimony credible. On the witness stand he was evasive on this point, as well as in much of his other testimony. There is no tangible evidence other than his testimony that the bills were paid. Moreover, since he quit his job in late 1960 or early 1961, and then traveled to Washington State in March, there was a period in which he was unemployed and we think it highly probable that he would not have had sufficient funds to live on during this period, other than through utilization of his deceased mother's money. Edward's salary and excess in entertainment allowances in 1960 from the Minneapolis Society for the Blind was about $8,600. At this time (1960 and 1961) he was paying $97.50 a month in child support to his first wife. After a consideration *274 of all these factors and Edward's unsatisfactory testimony, we cannot conclude that Edward paid Mabel's bills or that his intention during this period was to do so. We conclude that petitioner has not carried his burden of going forward to persuade us that the transfer on November 3, 1960, was other than with the intent of misappropriating the funds. Accordingly, respondent has met his burden of proof under the six-year statute of limitations. There 481 was an omission from gross income of the amount of $13,045.08 in 1960 which was well over 25 percent of the gross income reported in his return for that year. We also conclude that respondent correctly assessed an additional tax for the omission under section 6653(a)[8] though the amount must be modified in accordance with this opinion. The burden of proof was upon petitioner to prove that the omission was not due to negligence or an intentional disregard of rules and regulations within the meaning of that section. We cannot conclude, on this record, that petitioner has met this burden. *275 Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. The stipulation states the conversation was with Mrs. Peterson, but from the context of the stipulation and trial testimony we think this in error.↩
3. SEC. 61(a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * *. ↩
4. Petitioner contended on brief that respondent abandoned this argument at trial. Since we find against respondent on this point, we deem it unnecessary to consider this contention of petitioner.↩
5. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * ↩
6. SEC. 6501(e) Substantial Omission of Items. - Except as otherwise provided in subsection (c) - (1) Income Taxes. - In the case of any tax imposed by subtitle A - (A) General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
7. (22) On November 3, 1960, at the request and direction of petitioner, the full balance of $13,045.08 in the account of "Edward B. Adams as Trustee for Mabel B. Adams" was transferred to a checking account with The First National Bank of Saint Paul, Minnesota in the name of "Edward B. Adams, 627 North Lexington Parkway, St. Paul 4." * * *↩
8. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩