AUBREY M. SHIDELER and GERRY R. SHIDELER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shideler v. Comm'r
Docket No. 4227-68. United States Tax Court
T.C. Memo 1973-42; 1973 Tax Ct. Memo LEXIS 286; 32 T.C.M. (CCH) 188; T.C.M. (RIA) 73042; February 20, 1973, Filed Decision was entered for petitioners. Louis J. Glazier, for the petitioners. John E. White, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for 1960 and 1961 as follows: Additions to Tax Year
Deficiency
(Sec. 6653(a), I.R.C. 1954)
1960
$ 3,191.47
$ 159.57
1961
2,444.70
122.24
*287 The issues for decision are whether petitioner Gerry R. Shideler embezzled money from her employer during 1960 and 1961 which was taxable to petitioners in those years, and whether the additions to tax under section 6653(a)[1] are applicable. FINDINGS OF FACT Aubrey M. Shideler and Gerry R. Shideler (hereinafter referred to jointly as petitioners and individually as Aubrey or Gerry), husband and wife, were legal residents of Medina, Ohio, at the time their petition was filed. They filed timely joint Federal income tax returns for 1960 and 1961 with the district director of internal revenue, Syracuse, New York.
In July of 1957, Gerry became employed in the office of the Syracuse Fire Brick Supply Company (hereinafter referred to as Fire Brick) in Liverpool, New York. Aubrey started working for the business a month later. Fire Brick was started as a sole proprietorship on July 23, 1951, by Robert B. Hilliker (hereinafter Hilliker), and on July 1, 1960, he transferred the assets and liabilities of the business to a new corporation known as Foundry Materials, *288 Inc. (hereinafter Foundry), in exchange for all its stock. Both Fire Brick and Foundry were engaged in the foundry supply business. The purchased materials, such as sand, glaze, fire brick, sea coal, and bentonite, from manufacturers and then resold these items to foundries that produced metal castings. When Gerry first started working for Fire Brick in 1957, her duties and responsibilities were not extensive. She was engaged primarily in learning the operation of the business from its office manager. Subsequently, the office manager left Fire Brick's employ, and Gerry's responsibilities increased. By January 1, 1960, she had become Fire Brick's office manager. In that position, she was responsible for maintaining all its bookkeeping records, including the accounts receivable and payable ledgers and the sales journals. She prepared its monthly balance sheets and profit and loss statements. She did the purchasing, computed the invoice prices and checked the completed invoices, supervised the other office employees, contacted customers, and gave instructions to the construction and warehouse crews. After Foundry was incorporated, she became its secretary-treasurer and continued *289 to serve as office manager. During 1960 and 1961, the business maintained a checking account at The Merchants National Bank & Trust Company (hereinafter Merchants) of Syracuse, New York, and Gerry and Hilliker each were authorized to sign checks on that account. Gerry prepared and signed most of the checks drawn on the account during 1960 and 1961, and made the entries on the check stubs. She also reconciled the monthly statements on the account with the balance shown in the books and records. Throughout both years, Gerry did most of the office work. She kept Hilliker informed of the company's financial condition and, at least quarterly, provided his accountant with the bank statements and check, books, and other records as requested. The enlargement of Gerry's role in the daily operation of the business allowed Hilliker to spend less time in the office and more time in the activities he enjoyed - selling and developing new businesses. During 1960 and 1961, he was actively engaged in both pursuits and was never in the office for more than 2 days each week. In addition to Fire Brick and Foundry, Hilliker was also involved as sole owner, until the latter part of 1960, of the *290 Syracuse Blue Light Pool Company (hereinafter Blue Light). Blue Light utilized the Guinte process to construct swimming pools. He financed this endeavor at some unspecified date prior to 1960 with a $ 5,000 loan from Merchants. Blue Light lost money throughout the period of its operation and was finally discontinued in the latter part of 1960. At that time, Hilliker sold its equipment to a former employee for approximately $ 375. Blue Light's expenses were paid by Fire Brick or Foundry and were deducted as operating expenses. Hilliker also acquired a one-third interest in the Bobart Sheet Metal Supply Company (hereinafter Bobart) on some unspecified date prior to 1960. Bobart was a corporation engaged in the business of selling warm-air heating equipment to contractors. Its predecessor, M & M Supply Company, had gone into bankruptcy. Hilliker financed this venture by mortgaging some personal property and by using some money he received from his father-in-law. From the time he purchased this interest until he finally sold it in 1961, Bobart barely broke even. It filed its own tax returns. In 1959, Hilliker made three trips to California to investigate the possibility *291 of investing in a corporation known as the Blastcrete Company (hereinafter Blastcrete). Each of these visits lasted about 7 days, and all the expenses were paid by Fire Brick and treated as an expense of its operation. Blastcrete manufactured a pneumatic gun used in the Gunite process. In 1960, Hilliker and his estranged wife borrowed $ 8,000 from Merchants and used the money to purchase an interest in Blastcrete. In 1960, Hilliker organized the Trojan Pneumatic Equipment Company (hereinafter Trojan) to design and manufacture a pneumatic gun similar to the one produced by Blastcrete. Although he owned all of Trojan's stock during 1960 and 1961, he never directly contributed any money to it. Fire Brick or Foundry paid some of the expenses of this venture, and those payments were deducted as operating expenses. In June of 1960, Morris Enbody (hereinafter Enbody) and Ed Nolan (hereinafter Nolan) commenced initial efforts to design Trojan's gun. They spent 3 months on the project and then their plans were turned over to the Utica Steam Engine and Boiler Company (hereinafter Utica) for improvement. Fire Brick or Foundry paid for the materials used by Enbody and Nolan and paid *292 Enbody's salary during this period. The remaining unpaid development costs included a $ 6,000 bill for Nolan's services and an $ 11,000 debt to Utica. By the beginning of 1961, Hilliker, Enbody, and Aubrey were engaged in efforts to sell the gun. Their salaries were paid by Foundry. During both years in issue, Hilliker was in financial trouble. His involvement with Blue Light, Bobart, Blastcrete, and Trojan had not fared as he had hoped. Since Hilliker's time as well as Foundry's funds were being diverted to these ventures, Foundry was also in a precarious position. Several of its suppliers placed Foundry on a c.o.d. basis during 1960 and 1961. Hilliker was also faced with rather large personal expenses during those years. He and his wife had been separated since December of 1959, and he was paying $ 100 or $ 105 per week to help support her and their two children. In 1960, this amount approximated his salary from Foundry before reduction by withholding taxes. Starting in June or July of 1960, he and a girlfriend began living together in an apartment that cost $ 85 or $ 90 per month. His girlfriend held a job, however, and earned $ 85 per week from October to December *293 of 1960 and $ 90 or $ 95 per week during 1961. In addition, in 1960, Hilliker cashed in a life insurance policy with Equitable of Iowa for $ 482.97. Also in that year, he personally received $ 375 from the sale of Blue Light's assets. During 1960, he and his estranged wife also signed several notes to Merchants, secured by life insurance policies in the face amount of $ 16,000, and in 1961, they signed several renewal notes covering one of the 1960 loans. At some unspecified time prior to 1960, Hilliker established a special cash fund in Fire Brick. This fund was maintained by checks drawn on the company's checking account. The purpose of the account was twofold. First, it was to provide a source of money for some of Hilliker's personal, travel, and business needs. Second, it was designed to allow these amounts to be deducted as an operating expense of the business. Gerry had personal responsibility for maintaining this special cash fund, as well as the other accounting records, during 1960 and 1961. Moneys were obtained for the fund through the use of two types of checks. In some instances, she would personally cash a check and place a fictitious charge on the check *294 stub. At other times, she would cash a check for an amount in excess of the sum required to pay a supplier and charge the whole amount to that supplier's invoice. In both cases, she would make the check payable to "Cash" while placing on the stub an entry indicating that it was payable to the supplier. She kept a record on the invoice of how much was actually used to pay the supplier. This record was contained in a folder on the supplier's account. Gerry kept informal records on the special cash fund which showed how much money had gone into the fund and where it was used. Hilliker reviewed these informal records three or four times each month, and after the review, Gerry destroyed the records, as well as the checks that were shown on them. By the middle of 1961, Foundry's loans from Merchants in an amount in excess of $ 11,000 were delinquent. At that time, Merchants learned that some of the accounts receivable, pledged as security for these loans, were fictitious, and in the fall of that year, its attorneys demanded immediate payment on the outstanding debt. This demand required Hilliker to seek additional capital. Hilliker's girlfriend closed an out-of-State bank account *295 and gave him $ 631.98. His father gave him approximately $ 4,042 to help him through his difficulty with Merchants. When his father died in either September or October of 1961, Hilliker received $ 784.93 from his father's bank account and $ 1,341.49 from life insurance. In 1961, he also sold a piece of Foundry's equipment for approximately $ 1,700. In that year, Foundry also received some commission checks ahead of time.
By January of 1962, Foundry's financial position was so precarious that petitioners decided to leave its employ. By accepting liability for part of Trojan's debts, they acquired a controlling interest in that enterprise from Hilliker. Petitioners and Hilliker parted on an amicable basis even though petitioners had previously refused Hilliker's repeated requests for financial assistance. Hilliker's girlfriend became Foundry's office manager when Gerry left that position. In 1960 and 1961, petitioners' combined income before reduction for withholding taxes was $ 10,614.23 and $ 10,976.68, respectively. In addition to these amounts, petitioners had other moneys available during this period. They received $ 2,200 from an F.H.A. home-improvement loan, and they *296 borrowed $ 4,500 from Gerry's mother. They borrowed approximately $ 9,000 from Merchants on March 13, 1961; this loan was repayable over a period of 60 months. On December 20, 1961, each of them borrowed $ 500 from the Seneca Federal Savings and Loan Association (hereinafter Seneca) of Liverpool, New York. During these years, petitioners made the following disposition of their funds: They deposited $ 720 each year in their savings account at the First Trust and Deposit Company of Liverpool, New York; in 1961, they deposited a total of $ 1,200 in two savings accounts at Seneca; they deposited between $ 2 and $ 5 per week in a Christmas Club account at Seneca; in 1960, they paid $ 400 to have their kitchen remodeled and $ 700 to purchase a new dishwasher, stove, and refrigerator; in either 1960 or 1961, they paid $ 2,000 to have a new furnace installed in their home and $ 1,100 for new furniture, draperies, and carpeting; in 1961, they paid $ 10,000 for a new mobile house trailer and closed out a loan they had taken out in 1959; and in December of 1961, they purchased a new color television. This last expenditure was a family Christmas present and was paid for, in part, with money *297 withdrawn from the Christmas Club account. In February of 1962, Dominick Fanticone (hereinafter Fanticone) invested some money in Foundry and became its vice president. Shortly thereafter, he and Hilliker decided that the corporation would need additional financing. Because of Fanticone's past dealings with the Marine-Midland Bank (hereinafter Marine), Foundry submitted a loan application to that bank. Before the loan could be granted, Marine required Foundry to submit a balance sheet and a profit and loss statement. Louis Adornato (hereinafter Adornato), an accountant, was retained to prepare these statements. At Fanticone's insistence, an in-depth audit was conducted. In April or May of 1962, Adornato commenced the audit, and letters were sent to all the corporation's known suppliers. Adornato found that Gerry had drawn checks on the checking accounts of Fire Brick and Foundry which were not used for the purposes stated on the check stubs, and he concluded that she had embezzled these amounts. Based on Adornato's findings, a meeting was held in either May or June of 1962 between Gerry, Hilliker, Fanticone, the accountant, and two attorneys. Neither of the attorneys *298 represented Gerry. One of the attorneys was the local assistant district attorney. At that meeting, Gerry was accused of embezzling various amounts from the corporation during 1960 and 1961. She denied the charge and attempted to find the suppliers' invoices to support her contention that a special cash fund existed during that period, that she had not benefited from the amounts alleged to have been embezzled, and that some of the money was used to pay suppliers. The files which she attempted to locate were missing. Also, Hilliker denied any knowledge of the account. To date, no civil claim or criminal charge has been brought against Gerry. On its Federal income tax return for an unspecified year after 1961, Foundry claimed a loss of $ 22,000 for these embezzlements. Through a notice of deficiency issued on June 16, 1968, respondent denied the deduction. Foundry paid the tax and did not contest respondent's determination. In the notice of deficiency sent to petitioners, respondent determined that they had embezzlement income of $ 10,969.83 in 1960 and $ 8,975.82 in 1961. ULTIMATE FINDINGS OF FACT Gerry did not embezzle funds from Hilliker or Foundry during 1960 or *299 1961. OPINION There is no dispute as to the law applicable in this case. Embezzled funds constitute taxable income to the embezzler under section 61(a), James v. United States, 366 U.S. 213, 6 L. Ed. 2d 246, 81 S. Ct. 1052 (1961), and this is the rule even if some of the funds were embezzled before May 15, 1961, the date on which the Supreme Court, in James, overruled its prior opinion in Commissioner v. Wilcox, 327 U.S. 404, 90 L. Ed. 752, 66 S. Ct. 546 (1946). See United States v. Siano, 356 F.2d 927, 928 (C.A. 2, 1966). Accordingly, the only issue is whether Gerry, during 1960 and 1961, embezzled money from Hilliker and his corporation, Foundry Materials, Inc. [2] We think the preponderance of the evidence supports Gerry's contention that she did not do so. *300 Gerry testified that she placed a fictitious charge on the stub of some of the checks she drew on the business checking account. These stubs would erroneously indicate that the proceeds of the checks were used to pay expenses of the business, while, in fact, only parts of the total proceeds from those checks were so used. The remainder of the money was placed in a special cash fund and was used by Hilliker for personal and travel expenses and to finance his various unsuccessful business ventures. According to her testimony, Gerry kept Hilliker currently informed as to how the funds were being used, and she denied that she converted any of the money to her own use. She admitted that she was aware that this falsification of Foundry's records was wrongful, but she rationalized her action on the ground that she was following her employer's instructions. Hilliker stated that, during 1960 and 1961, he did not know that the check proceeds were used for any other purposes than the ones stated on the stubs. The issue is purely factual. From our observation of the witnesses and a careful analysis of the record as a whole, we think Gerry's testimony is credible. Moreover, we think it *301 is corroborated by several collateral facts. We begin with the fact that the erroneous records were discovered by an accountant who conducted an in-depth examination of the corporation's books at the insistence of a third party whom Hilliker had induced to invest in the business. It was not instituted by Hilliker, the sole owner of the business during the period when it was deteriorating and the alleged embezzlements were occurring. At the meeting where it was first alleged that Gerry had misappropriated business funds, the individuals present included a lawyer who was the local prosecuting attorney. Yet no criminal charges were ever brought against Gerry, and no suit for the recovery of any of the allegedly misappropriated funds was ever instituted against her by either Hilliker or Foundry. Significantly, the new part-owner, Fanticone, would have benefited indirectly from a successful suit by the corporation against Gerry. Moreover, although Foundry claimed a deduction on its income tax return for the alleged loss, the item was disallowed by the Internal Revenue Service, and Foundry acquiesced in the disallowance. Cf. B. C. Cook & Sons, Inc., 59 T.C. (1972). Hilliker's *302 explanation - that the costs of attempting to effect a recovery of the alleged misappropriations and the claimed overpayments of tax would have been too high - is not convincing. Again, Fanticone, as a shareholder in Foundry, would have been an indirect beneficiary of the allowance of a deduction for the allegedly embezzled funds. Furthermore, as detailed in our Findings, Hilliker's expenditures appear to have exceeded the amounts of money otherwise available to him. According to his testimony, during 1960, for example, he had "take-home" pay of less than $ 4,800. He was separated from his wife and was paying her about $ 100 per week for her support and that of their children. He was also sharing an apartment with a girlfriend whose income ($ 85 to $ 95 per week) was hardly adequate to support both of them and make up the deficit, even if it be assumed they were living with Spartan frugality. When confronted with these facts, Hilliker's only explanation was that he had borrowed money from Merchants to help cover his expenses. The record discloses that Hilliker and his estranged wife took out various joint loans from Merchants during 1960 and 1961. However, those loans did *303 not provide him with any significant amount of money. Hilliker testified that the loans were secured by life insurance in the face amount of only $ 16,000. In view of his investments and the loan repayments which he made during this period, the actual amount available to him was rather small. Gerry's testimony was concentrated on two basic points. First, she coupled her denial of any misappropriations of funds with testimony that she and her family had sufficient funds, including the amounts initially deposited in savings accounts, to cover most of their expenditures during 1960 and 1961. She described the various expenditures they made, and she showed generally the source of the funds for each major outlay. The interest deductions claimed on the joint Federal income tax returns filed by petitioners - which amounts have not been questioned by respondent - support her testimony that many of the expenditures were financed through loans. The second part of her testimony concerned the special cash fund maintained in the business. Her testimony on the existence of this account is corroborated by collateral facts in the record. First, Hilliker's accountant examined the corporation's *304 books and records, at least once every three months, during 1960 and 1961. It seems improbable that Gerry could have embezzled this money without his being aware of it. The second point was the financial condition of the corporation. Since Foundry was operating near the margin of insolvency, it seems unrealistic to think that, if Gerry had been taking large sums of money, the increased "expenses" she paid in 1960 and 1961 would not have been questioned by either Hilliker or his accountant. The only real weakness in Gerry's testimony was her failure to document or corroborate her testimony regarding a $ 4,500 loan from her mother. However, notwithstanding this weakness, the preponderance of the evidence supports our Finding that she did not embezzle the funds charged to her as income.
In weighing Hilliker's conflicting testimony, we have taken into account his action in pledging fictitious accounts receivable with Merchants Bank, the unlikelihood that he would not have detected the misappropriation of such large sums from his relatively small business, and the inadequacy of his explanation of the source of his investments and expenditures during this period, as well as his failure *305 to press either a criminal charge against Gerry or a claim for reimbursement from her. We conclude that Gerry did not embezzle funds from Hilliker or Foundry during 1960 or 1961. In view of this conclusion, petitioners are not liable for the additions to tax under section 6653(a). Accordingly, Decision will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue. ↩
2. The problem as to where the burden of proof rests on this issue is somewhat unusual. In his opening statement, respondent's counsel informed the Court that consents extending the statute of limitations were signed and filed by petitioners after the expiration of the 3-year statute of limitations on assessments prescribed by sec. 6501(a) but within the 6-year period provided by sec. 6501(e). This latter provision is applicable only where the taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return. Where a petitioner has pleaded the statute of limitations, the burden of showing the 25-percent omission required for the application of sec. 6501(e) rests with respondent, and a waiver of the statute is not effective unless the 25-percent omission is shown. United Business Corp. of America et al., 19 B.T.A. 809, 831-832 (1930), affirmed on other grounds 62 F.2d 754 (C.A. 2, 1933), certiorari denied 290 U.S. 635 (1933); Gaylord C. Peters v. Commissioner, 51 T.C. 226, 230-231 (1968); and C. A. Reis, 1 T.C. 9 (1942), affd. 142 F.2d 900↩ (C.A. 6, 1944). However the bar of the 3-year statute was not pleaded and the parties have briefed the case as if the burden on all issues rested with petitioners. We have so viewed the evidence.