ALBERT L. SHIPLEY, JR., and EVELYN C. SHIPLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shipley v. Commissioner
Docket No. 2695-74.
United States Tax Court
T.C. Memo 1981-630; 1981 Tax Ct. Memo LEXIS 125; 42 T.C.M. (CCH) 1559; T.C.M. (RIA) 81630; October 26, 1981. Timothy R. Nibler and LeRoy Snyder, Jr., for the petitioners. Robert F. Geraghty, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioners' Federal income tax for the calendar years 1967, 1968, and 1969, in the respective amounts of $ 116,004.75, $ 3,033.99, and $ 11,694. The issues for decision are: (1) whether *127 at least $ 239,500 over which petitioners gained complete dominion and control in 1967 is properly includable in their gross income for that year; (2) whether, if petitioners are entitled to a deduction in 1970 under section 461(f), [1] they may carry-back any portion of it to 1967 pursuant to section 172; (3) whether petitioners are entitled to relief under section 1341; (4) whether petitioners are entitled to deductions for conservator's expenses for 1967 through 1969 in excess of amounts allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners are husband and wife who resided respectively in Honolulu, Hawaii, and Menlo Park, California, at the time the petition herein was filed. [2] They timely filed joint Federal income tax returns for 1967, 1968, 1969, and 1970, with he Internal Revenue Service. During 1967 petitioners lived in Fresno, California. At that time Albert L. shipley (hereinafter Albert) was president of the First National Bank of Fresno (FNBF). *128 On or about June 11, 1967, Albert's 81-year-old uncle, [3] George H. Capron (hereinafter George), arrived in Fresno in an old, dilapidated stationwagon packed with personal effects and papers, including financial records dating back to 1920. After two days in a Fresno motel, George contacted Albert, who visited him in the motel. Albert had not seen George since 1964, and was surprised to find him lost and confused, neither knowing what he was doing nor where he was going. Furthermore, George had the appearance of an old derelict--hungry, thin, and dressed in rags. Upon observing George's physical and mental state, Albert took general charge of him. George was a self-made man [4] who had amassed in excess of $ 24,000,000 through real estate dealings during his lifetime. His personal net worth in June 1967 was at least $ 12,000,000. [5] At least from the time his wife died (and probably long before that) George was mentally ill, delusional, and suffering from *129 severe paranoia. Following his wife's death George showed evidence of marked physical and mental deterioration. He neglected his business affairs, became distrustful of close friends, and became indifferent to his personal cleanliness, hygiene and appearance. In December 1965, conservators of his estate were appointed. This conservatorship was terminated in 1967 upon recommendation of his doctors that such was adversely affecting his physical health. His mental state worsened after Albert took charge of him in 1967. For example, while on a trip to Winnipeg, Canada, with petitioner Evelyn C. Shipley (hereinafter Evelyn) in early August 1967, George ran away from where he was staying and became so belligerent and irrational that Winnipeg police took him into custody. He was then placed in the psychiatric ward of a local hospital. Upon securing his release, Evelyn immediately made arrangements for her and George to fly back to Fresno via Minneapolis. While en route to Minneapolis, *130 on August 8, 1967, however, George's behavior became so irrational and belligerent that the pilot radioed ahead to have George taken into custody by police when the flight arrived. George was certified unfit to fly by the FAA, and placed in St. Mary's Hospital in Minneapolis where he remained until August 28, 1976, under the care of Dr. Robert P. Jeub. Dr. Jeub, an eminent and highly qualified physician, specializes in neurology, psychiatry, and electroencephalograph. He testified, and we find: George H. Capron suffered from a paranoid state of many years duration. He was delusional; his delusions being generally persecutory and grandiose in nature. * * * * * * this individual had multiple paranoid diatheses, possibly beginning as far back as 1915. Although these became progressive, he was eventually saved from many of his problems by the fact that he did seek legal help sometime in the mid-1940s. * * * * * * it is my opinion that it can be said with a reasonable degree of medical certainty, during the time this individual was my patient, he did not possess sufficient intelligence to understand the nature, purpose or effect of his acts, and he definitely did not have *131 the power to exercise free will and free thinking in relation to his bounty. It is my further opinion that it can be said with a reasonable degree of medical certainty, this individual did not have the mental capacity to understand the nature, purpose nor the effect of his acts, nor did he have the power to exercise free will in relation to his property, not only on July 25, 1967, but for many, many months, even over a year, prior to the date he came under my care. Subsequent to August 1967, George continued to display irrational behavior and was constantly in and out of hospitals for psychiatric treatment notwithstanding that he was attended to by a male nurse who regularly administered tranquilizing drugs to him. Upon taking charge of George, petitioners examined the papers and other effects in George's stationwagon. Among these papers were several checks totaling in excess of $ 10,000, which Albert deposited in a trustee account at FNBF, naming himself as trustee. George also had arrived in Fresno with $ 7,400 in American Express Traveler's Cheques in $ 100 and $ 500 denominations. Between June 28, 1967 and August 4, 1967, Albert negotiated $ 5,200 in said traveler's *132 cheques at FNBF for cash or cashier's checks payable to Albert or Evelyn. FNBF's head teller questioned such negotiations because the cheques had not been countersigned in her presence nor did they show Albert as payee or contain his endorsement. Notwithstanding, Albert refused to place him name on the payee line or endorse the cheques, but authorized and ordered her to cash them, saying that he witnessed George signing them. In fact, the countersignatures on the cheques were forgeries. On June 27, 1967, Albert instructed an attorney to draft a will for George, leaving one-fourth of his property to petitioners. The attorney prepared the will and delivered it to Albert, but never spoke to George about it. On July 25, 1967, George purportedly signed a gift deed prepared by Evelyn, giving her a check for $ 239,500, which was then being held by George's friend in Minneapolis. On or about August 8, 1967, Albert received the cashier's check for $ 239,500 which previously had been held by George's friend for safe keeping at George's request. Albert deposited this check into the trustee account in FNBF. On August 16, 1967, Albert transferred the $ 239,500 from the trustee account *133 to a newly opened account in Evelyn's name. These funds were subsequently used by petitioners to purchase, inter alia, a house titled in their names. On August 31, 1967, Albert, on his own petition, was appointed temporary conservator of George's person and estate. (He was appointed permanent conservator on November 9, 1967.) On September 1, 1967, Albert closed the FNBF trustee account by withdrawing the balance of $ 11,074.41. This withdrawal was never reported in any conservatorship accounting. On October 29, 1967, Albert notified his attorney that George had signed the will prepared by the attorney the previous June. On February 28, 1968, Albert, for the first time, notified his attorney of the alleged gift of $ 239,500 from George to Evelyn on July 25, 1967. He did so on the advice of his father, who was a CPA and an attorney. Albert also ordered his attorney to report the transfer as a gift in the amount of $ 183,185.06. Petitioners paid Federal gift taxes on the gift in the amount of $ 56,314.94. In April or May 1970, Albert's conservatorship was challenged by certain friends and relatives of George in the Superior Court of California. Petitioners' dealings with *134 respect to the $ 239,500 check, the traveler's cheques and the trustee account were revealed. During these proceedings petitioners produced a gift deed purportedly signed by George on July 25, 1967, giving Evelyn the $ 239,500 check. Prior to these proceedings no one, not even the petitioners' attorney who prepared the gift tax return, had been this document. Ultimately, in May 1971, Albert was removed as conservator of George's person and estate, denied any compensation for services rendered to the estate after December 1, 1968, and surcharged (including interest) in the total amount of $ 550,595.65. [6] The surcharge was grounded on the court's findings that the purported gift document was not genuine and that Albert, utilizing his position at FNBF, and in concert with Evelyn, had embezzled the cashier's check, trustee account funds, and traveler's cheques. After an unsuccessful appeal Albert paid $ 550,595.65 in 1975 to George's estate. *135 In May 1970, during the conservatorship proceedings, it had become apparent that Albert would be surcharged on account of his failure to recover the funds which he and Evelyn had embezzled from George's estate in the months immediately preceding his conservatorship. Albert deposited certain property, including his home and various securities, into a title company account. The deposit was accompanied by instructions, signed only by Albert, that the title company hold the property to cover any judgments arising out of the conservatorship proceedings. A representative of the title company spoke with attorneys of the guardian ad litem of George's estate (Otto Berg) about the assets in escrow in 1970, assuring him that no action would be taken with regard to these assets absent agreement of the parties or a court order. Written escrow instructions from Otto Berg, however, were first mailed on December 31, 1970, and received by the title company on January 4, 1971. A refund of state and Federal gift taxes paid on the purported gift of $ 239,500 to Evelyn was obtained by Otto Berg (approximately $ 66,500) and paid to Evelyn pursuant to a court order on October 24, 1974. Petitioners *136 have not reported any income from the dealings described herein. [7] Respondent has determined that funds of George H. Capron over which petitioners gained complete dominion and control during the years in issue constitute income to them. Respondent has also disallowed certain conservatorship expenses of petitioners for all of the years in issue on the basis that they have not been properly substantiated. OPINION Petitioners contend that the $ 239,500 cashier's check received by Evelyn was a valid gift from George evidenced by a gift deed and is thus excludable under section 102. Further, they maintain that the balance of $ 11,074.41 withdrawn from the trust account on September 1, 1967, was a gift from George to be used by petitioners for their daughter's education. [8] Conversely, respondent argues that petitioners embezzled the cashier's check, the trustee account funds, and the traveler's cheques ($ 255,774.41) from George *137 in 1967. To the extent petitioners are found to have embezzled funds in 1967, they have income for that year under section 61(a). James v. United States, 366 U.S. 213 (1961). The petitioners have the burden to prove the merits of their claim and to overcome the presumption of correctness which attaches to respondent's determination. Welch v. Helvering, 290 U.S. 111 (1933); Rockwell v. Commissioner, 512 F.2d 882 (9th Cir. 1975); Rule 142(a), Tax Court Rules of Practice *138 and Procedure. From the evidence presented it is clear that petitioners have entirely failed to meet their burden. With respect to the $ 5,200 in traveler's cheques, petitioners have presented no evidence whatsoever which would tend to show that these cheques were a gift from George. In fact, the petitioners' evidence here tends to prove misappropriation of the cheques. As for the withdrawal of $ 11,074.41 from the trustee account, the only evidence offered by petitioners that these funds were not embezzled is Albert's uncorroborated testimony that the proceeds of the trustee account were used by petitioners, with George's approval, for their daughter's education. We find Albert's testimony entirely unbelievable in this regard. The withdrawal from the trustee account occurred on the day after Albert was appointed temporary conservator of George's person and estate, and it was never reported by him in subsequent conservatorship accountings. It is apparent that he misappropriated these funds on the belief that if he acted quickly the very existence of a trustee account in FNBF would never be detected. Petitioners strenuously argue that the cashier's check in the amount of *139 $ 239,500 received by them in August 1967 was acquired by gift from George to Evelyn. Not only is the testimony of both Albert and Evelyn in this regard quite beyond belief, but the respondent's evidence overwhelmingly supports our finding that these funds also were embezzled by petitioners. George's friend in Minneapolis sent Albert the check on August 8, 1967, with instructions to give it to George or his legal representative. Without informing George that he had received the check, Albert deposited it in the trustee account. Only eight days later Albert transferred the $ 239,500 to Evelyn's account. Surely if George had made the gift on July 25, 1967, as petitioners maintain, Albert would have sought George's endorsement and deposited the check directly into Evelyn's account. Moreover, according to the testimony of Dr. Jeub, while in Minneapolis on August 8, 1967, Evelyn told him that George had never given her a penny. Obviously, she was unaware that Albert had, that very day, received the cashier's check in Fresno and that he had plans to misappropriate it. These facts plus a multitude of others, too numerous to mention specifically, but including various inconsistencies *140 in petitioners' testimony, several forgeries, and other embezzlement of George's property, which exhibit a pattern of dishonesty, lead us to believe that the gift deed purportedly executed by George on July 25, 1967, is a false document. We suspect that it was prepared as an afterthought just in case the transfer of the check was ever discovered. [9]
Petitioners assert that if the $ 239,500 cashier's check is included in their income for 1967 then the gift taxes paid ($ 56,314.94) should reduce the amount included. We disagree. George's estate was primarily obligated to pay any gift taxes. Petitioners never informed the estate of the gift and paid the gift taxes themselves to avoid discovery of the gift by third parties. Moreover, petitioners received a full refund of the gift taxes plus interest. Under these circumstances petitioners are not entitled to an offset for payment in 1968 of the asserted gift tax liability. Petitioners claim that if *141 they are found to have embezzlement income in 1967, then they are entitled to a deduction in 1970 for depositing property in an alleged escrow account during that year under section 461(f). It is their position that such a deduction will result in a net operating loss carry-back to their 1967 taxable year pursuant to section 172. It is well settled that embezzlement is not a "trade or business." Mannette v. Commissioner, 69 T.C. 990 (1978). Repayments of embezzled funds are deductible only under section 165(c)(2) as losses incurred in a transaction entered into for profit, not under section 165(c)(1) as trade or business losses. Mannette v. Commissioner, supra; Yerkie v. Commissioner, 67 T.C. 388 (1976). Nonbusiness losses under section 165(c)(2) are not included in net operating losses to the extent provided by section 172(d)(4). Mannette v. Commissioner, supra; Yerkie v. Commissioner, supra.Thus, under the facts herein, even if petitioners are entitled to a deduction under section *142 461(f) in 1970, they are not entitled to carry-back any portion thereof to 1967, 1968, or 1969--the years at issue in the instant litigation. Having so found, it is inappropriate for us to further consider petitioners' entitlement to a deduction under section 461(f) for 1970 since that year is not properly before this Court. Petitioners also maintain that they are entitled to relief under section 1341 because of their deposit of assets in an alleged escrow account in 1970. This issue is currently before the United States District Court for the Northern District of California, where petitioners have filed suit for refunds with respect to their taxable years 1970 and 1971. The refund action was initially dismissed by the District Court for lack of jurisdiction because petitioners had not included the amounts in question in their 1967 income. The decision was reversed and remanded by the Ninth Circuit Court of Appeals with instructions that the refund action be stayed pending the outcome of this Tax Court litigation. See Shipley v. United States, 608 F.2d 770 (1979). Accordingly, this issue is not before the Court in this case. [10]
*143 Finally, in their petition, petitioners maintain that they are entitled to conservator expenses in excess of those allowed by respondent for their taxable years 1967 through 1969. Petitioners have the burden to prove respondent's determination incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. No evidence whatsoever has been presented by petitioners on this issue. Accordingly, we find that petitioners have failed to meet their burden. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Petitioners were divorced on April 9, 1974. Petitioner wife is now Evelyn Needham.↩
3. Albert's mother was the sister of George's wife of 50 years, Ednah. Ednah died one week after divorcing George in 1965.↩
4. George died on October 26, 1972, subsequent to the years here in issue. ↩
5. Pursuant to the divorce decree in 1965, George's ex-wife received approximately $ 12,000,000 of their community property.↩
6. In June 1972, petitioners were indicted by a grand jury on three counts of grand theft of George's property. They ultimately plead nolo contendere to one count, with the other counts dismissed, and judgment was entered against them in October 1972.↩
7. Petitioners have conceded the correctness of respondent's inclusions↩ for taxable years 1968 and 1969, and they have conceded the correctness of respondent's disallowance of certain deductions for alimony claimed by petitioners in 1968 and 1969.
8. During the trial petitioners presented no evidence with respect to the $ 5,200 in traveler's cheques cashed by them, except that the proceeds were put in petitioners' checking account or safe deposit box, and on brief they do not address either the traveler's cheques or the $ 11,074.41 withdrawal from the trust account. In their petition herein petitioners maintained that both of these amounts constitute excludable gifts. We shall proceed on the basis that this is still their position since they have not specifically conceded that these amounts were income to them.↩
9. Having found that petitioners embezzled the funds here in issue it is unnecessary for us to determine whether George possessed the requisite mental capacity to make gifts to petitioners on and subsequent to July 25, 1967.↩
10. We note in passing that it is the position of this Court that embezzled funds are not received under claim of right; therefore, relief under section 1341 is not available upon repayment of embezzled funds. James v. United States, 366 U.S. 213 (1961); Yerkie v. Commissioner, 67 T.C. 388↩ (1976).