CAROLE D. WINDFELDER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Windfelder v. Commissioner
Docket No. 16591-85.
United States Tax Court
T.C. Memo 1988-290; 1988 Tax Ct. Memo LEXIS 318; 55 T.C.M. (CCH) 1206; T.C.M. (RIA) 88290; June 30, 1988; As amended July 6, 1988 Robert O. Rogers, for the petitioner. Nelson E. Shafer,Mark J. Miller, and Steven R. Guest for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies *319 [1] in petitioner and her husband's Federal income tax for their 1978 and 1979 taxable years, in the amounts of $ 313,248.21 and $ 35,931.14, respectively. All issues relating to the underlying tax dispute have been disposed of by agreement. The sole issue is whether petitioner may avail herself, as an innocent spouse, to the protection of section 6013(e). [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulated facts and the exhibits attached thereto are incorporated herein by reference. Carole D. Windfelder and her husband, Donald H. Windfelder ("petitioner" and "Mr. Windfelder", respectively, or "the Windfelders", collectively), resided in Palm Beach, Florida, at the time the petition in this case was filed. Although *320 the years at issue involve joint returns, Mr. Windfelder is not a party to this suit. Petitioner and Mr. Windfelder were married in 1972, and resided from that time until 1981, with petitioner's two children from a previous marriage, in a suburb of Milwaukee, Wisconsin. During the years at issue, petitioner was, in addition to her duties as a homemaker, engaged in supervising the refurbishing of the Windfelder's future Palm Beach residence. Mr. Windfelder was employed as an investment advisor for Northwestern Mutual Life Insurance Company ("Northwestern"), at a yearly salary of approximately $ 75,000. From the spring of 1977 through the spring of 1978, Mr. Windfelder informally managed the financial affairs of Lauretta Windfelder, Mr. Windfelder's aunt who had raised him as her own son since he was 13 years old. In April of 1978, coincident to a move to a nursing home in Milwaukee, Wisconsin, Lauretta Windfelder executed a power of attorney giving Mr. Windfelder the formal authority to manage her financial affairs. While managing Lauretta Windfelder's finances, Mr. Windfelder embezzled from her $ 466,876 and $ 70,714, during 1978 and 1979, respectively. These amounts were *321 not reported on the Windfelders' joint returns for such years. Mr. Windfelder had told petitioner that such funds were gifts made by Lauretta Windfelder. Major portions of the amounts embezzled were deposited by Mr. Windfelder into a joint account maintained by the Windfelders at the First Wisconsin National Bank ("First Wisconsin account"). The embezzled funds not so deposited were placed into other accounts. In connection with Mr. Windfelder's plans for retirement and for removing Lauretta Windfelder from the nursing home, petitioner and her husband purchased, in the summer of 1978, a residence in Palm Beach, Florida ("Palm Beach home"). Renovations were made to the Palm Beach home during the last half of 1978 and early part of 1979 and were overseen by petitioner. While overseeing such renovations, petitioner spent substantial amounts making weekly flights to Palm Beach, staying occasionally in a hotel while there, and flying home to Milwaukee every weekend. During the Palm Beach home renovation, petitioner and her husband continued to maintain a residence in the Fox Point area of Milwaukee, an expensive suburb of such city. This Milwaukee home was sold in July of 1979, *322 and the Windfelders moved to an apartment also located in the Fox Point area, where they lived until the fall of 1981. In the fall of 1981, petitioner began residing in the Palm Beach home, whereas, Mr. Windfelder moved into a smaller apartment in Milwaukee, living there until he could retire from Northwestern without loss of pension benefits. Petitioner and her husband both resided in the Palm Beach home from the Spring of 1982 until such home was sold in 1984. The purchase price of the Palm Beach home was $ 175,000 and the cost of renovation was approximately $ 400,000. Of the total of $ 575,000, petitioner and her husband financed only $ 125,000. Substantially all of the remaining funds came from funds Mr. Windfelder embezzled and deposited into the First Wisconsin account. Although other funds were placed into the First Wisconsin account, e.g., proceeds from the sale of the Milwaukee home, the vast majority of the funds withdrawn from the First Wisconsin account during the period of renovation was the result of Mr. Windfelder's embezzlement. Lauretta Windfelder died in 1979 and the personal representative of her probate estate subsequently became aware of the embezzlements. *323 Thereafter, the estate brought an action against Mr. Windfelder to recover the stolen funds and ultimately won a judgment in the amount of $ 540,000. Further, in 1981, Mr. Windfelder was contacted by the Internal Revenue Service ("Service") concerning his and petitioner's failure to report the embezzled funds on their 1978 and 1979 returns. Subsequently, in May of 1982, Mr. Windfelder was notified that he was being investigated by the Department of Justice for criminal prosecution with respect to the years at issue for the filing of fraudulent returns by reason of his failure to report the embezzled funds. Despite these occurrences, it was not until August of 1984 that Mr. Windfelder told petitioner that he was a judgment-debtor to the estate, that he and petitioner were the subject of a civil examination by the Service, and that he was likely to the subject of a criminal prosecution by the Justice Department. Prior to that time, Mr. Windfelder had continually eluded any questions petitioner raised concerning their exposure by telling her that the investigations involved only Lauretta Windfelder's probate estate, and that the whole business was just a mistake which would be solved *324 shortly. After petitioner was told of their exposure, and after Mr. Windfelder was ultimately indicted for tax fraud, petitioner and Mr. Windfelder began to curtail their expenses and placed the Palm Beach home for sale or rent. The Palm Beach home was sold in March of 1985, approximately one month after Mr. Windfelder was convicted on the tax fraud charges. Petitioner and Mr. Windfelder realized net cash proceeds in the amount of $ 283,000 as a result of such sale. Petitioner and Mr. Windfelder immediately secreted $ 200,000 of such amount in a Bahamian bank account ("Bahamian account") under petitioner's name alone. This $ 200,000 was deposited in the Bahamas because petitioner and Mr. Windfelder intended to avoid their creditors, including Lauretta Windfelder's estate and, potentially, the Service. The remaining $ 83,000 was spent for personal expenses. Petitioner subsequently made withdrawals, in increments of $ 20,000 to $ 30,000, from the Bahamian account and would use some of the same to pay for her son's college education, her husband's legal expenses, and the family's living expenses. Some of the Bahamian withdrawals were further used when petitioner spent approximately *325 $ 20,000 over a 10-month period for weekly trips from Palm Beach, Florida to visit Mr. Windfelder who was then incarcerated in Eglin, Florida on his conviction for tax fraud, and when petitioner spent approximately $ 37,000 to pay her and Mr. Windfelder's joint tax liability for a later year. Petitioner spent another $ 28,000 of the Bahamian withdrawals to make a down-payment upon, and to refurbish, a Palm Beach condominium petitioner owned and occupied at the time of trial. Finally, petitioner continued, at the time of trial, to retain, in her name alone, approximately $ 15,000 in cash directly traceable to the last of the Bahamian withdrawals. OPINION The sole issue is whether petitioner may avail herself, as an innocent spouse, to the protection of section 6013(e). [3] Generally, when a joint tax return is filed by a husband and wife, each are jointly and severally liable for any tax due with respect thereto. Sec. 6013(d)(3). One spouse may be relieved of such liability, however, if: (1) a joint return was filed; (2) there was a substantial understatement of tax attributable to a grossly erroneous item of the other spouse on such return; (3) in signing the return, the spouse *326 seeking relief did not know, and had no reason to know, that there was such a substantial understatement; and (4) taking into account all the facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency in tax for such taxable year attributable to such substantial understatement. Sec. 6013(e)(1). [4] It is petitioner who bears the burden of establishing these elements. Adams v. Commissioner,60 T.C. 300, 303 (1973); Sonnenborn v. Commissioner,57 T.C. 373, 381-383 (1971); Rule 142(a). A failure to establish any one of these requirements will prevent petitioner from qualifying for relief under section 6013(e). Purcell v. Commissioner,826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Shea v. Commissioner,780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. in part a Memorandum Opinion of this Court. *327 Respondent has conceded that joint returns were filed and that such returns both contain a "substantial understatement of tax attributable to grossly erroneous items" of Mr. Windfelder. Since we hold hereinafter that it would not be inequitable to hold petitioner jointly and severally liable for the disputed taxes, and, therefore, she fails to qualify as an innocent spouse within the meaning of section 6013(e), we will not consider whether she has established that she did not know, or have reason to know, that there was a substantial understatement in the subject returns. A factor to be weighed in analyzing the equities of holding petitioner liable is whether she significantly benefited, directly or indirectly, from the omitted income. [5] "[N]ormal support is not a significant 'benefit' for purposes of this determination." Sec. 1.6013-5(b), Income Tax Regs.[6] "Unusual support or transfers of property to the spouse would, however, constitute 'benefit' and should be taken into consideration." S. Rept. 91-1537, at 3 (1970), 1971-1 C.B. 607. [7]
*328 Petitioner contends that she did not receive any benefit in excess of normal support because her standard of living did not change appreciably until 1984, when she became aware of the tax problems facing her and her husband and they began to consciously reduce their expenses. Petitioner further contends that she has received no significant benefit in the form of transfers of property to her. We do not agree with either of these contentions. Concurrent with the receipt of the embezzled funds in 1978 and 1979, petitioner and her husband began to maintain two residences; one in an expensive suburb of Milwaukee, and one in Palm Beach, Florida. Improvements in the amount of $ 400,000 were made to the Palm Beach home. Petitioner made weekly trips between the two homes, spending substantial amounts for air travel and hotels while overseeing such renovations. In subsequent periods, petitioner spent further amounts for travel to visit her incarcerated husband, and for partial satisfaction of a tax liability owed jointly with her husband for a later year. These amounts are substantial, beneficial to petitioner, and traceable directly to the embezzled funds; they flowed from the First *329 Wisconsin account to the Palm Beach home to the Bahamian account to their ultimate expenditure. Moreover, at the time of trial, petitioner continued to retain assets which were directly attributable to the omitted income; the condominium in Palm Beach and the $ 15,000 in cash. Thus, petitioner benefited significantly from the funds her husband embezzled, and such benefit was in excess of normal support. In addition to such a significant benefit, there exist other facts and circumstances concerning petitioner which do not cause the scales of justice to tip in her favor. When petitioner was fully aware of the criminal conviction of her husband for tax fraud, and of the judgment for Lauretta Windfelder's estate against her husband for his embezzlement, petitioner actively engaged in a scheme to avoid Mr. Windfelder's creditors by secreting jointly owned funds in the Bahamian account in her name alone. Petitioner contends her participation in such scheme was motivated by a belief in the legitimacy of their claim to such funds; however, we find such belief to have been unrealistic. Petitioner knew, at the time the funds were removed from this country, that two courts had determined *330 that the funds were not received by Mr. Windfelder as a gift but, rather, were the result of his embezzlement. For the reasons stated above, it would not be inequitable to hold petitioner jointly and severally liable. Accordingly, we hold that petitioner cannot avail herself to protection of section 6013(e). To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. In addition to the deficiencies in income tax, respondent also determined additions to tax for civil fraud with respect to petitioner's husband. Such additions to tax were not determined with respect to petitioner. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and applicable for the years at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. The parties do not dispute that embezzled funds are income where, as here, the funds were acquired without the consensual recognition of an obligation to repay and without restriction as to the disposition of the funds. See James v. United States,366 U.S. 213↩ (1961). 4. Section 6013(e) was amended by the Deficit Reduction Act of 1984 with retroactive application to all open taxable years to which the Internal Revenue Codes of 1954 and 1939 apply. See Pub. L. 98-369, sec. 424, 98 Stat. 494, 801-802; H. Rept. 98-432, (Part 2) 1501, 1503 (1984). ↩
5. Section 6013(e)(1)(C), prior to its 1984 amendment, explicitly required that we consider "whether or not the [spouse seeking relief] significantly benefited directly or indirectly from the items omitted from gross income", when determining whether it would be inequitable to hold that spouse liable for the deficiency in tax. While section 6013(e), as amended, no longer specifically requires that we make such a determination, this factor is still to be taken into consideration. See H. Rept. 98-432, (Pt. 2) supra at 1502; Purcell v. Commissioner,826 F.2d 470 (6th Cir. 1987), affg. 86 T.C. 228 (1986); DeMartino v. Commissioner,T.C. Memo. 1986-263↩. 6. These regulations were promulgated prior to July 18, 1984, the effective date of present section 6013(e), which no longer includes a specific reference to a significant benefits test. But see n. 5, supra.↩
7. Although section 6013(e) was amended in 1984, Congress' original explanation of the significant benefits test does assist us here, particularly in light of our retention of such test in Purcell v. Commissioner, supra,↩ as a factor to be considered when weighing the equities under section 6013(e)(1)(D).